

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-20-00441-CV

**IN THE INTEREST OF D.F.S.**, C.S.S., and C.R.S.

From the 131st Judicial District Court, Bexar County, Texas
Trial Court No. 2018-PA-02723
Honorable Peter A. Sakai, Judge Presiding

Opinion by:     Liza A. Rodriguez, Justice

Sitting:         Patricia O. Alvarez, Justice
                 Luz Elena D. Chapa, Justice
                 Liza A. Rodriguez, Justice

Delivered and Filed: February 17, 2021

AFFIRMED

Raquel C. and Armando S. appeal the trial court's order terminating their parental rights to eight-year-old D.F.S., six-year-old C.S.S., and five-year-old C.R.S. On appeal, both Raquel C. and Armando S. argue respectively that the evidence is legally and factually insufficient to support (1) the trial court's predicate finding pursuant to section 161.001(b)(1)(E) of the Texas Family Code and (2) the trial court's finding that termination of their parental rights was in the best interest of the children. We affirm.

### BACKGROUND

This case began when the Department received a referral on July 6, 2018 that alleged Armando S. and Raquel C. were using illegal drugs, engaging in domestic violence, and neglecting their children, who at that time were six, five, and three years old. According to the family-based

caseworker, it was alleged that Armando S. and Raquel C. were using illegal drugs in the presence of the children and then sleeping until the afternoon, leaving the children unsupervised and hungry. Armando S. and Raquel C. were also alleged to have been arguing, hitting, and pushing each other on a regular basis in the presence of the children. The family-based caseworker also testified that at the time of the referral, "criminal charges [were] pending for assault between Armando [S.] and Raquel [C.]." When the family-based caseworker received the referral, she implemented a safety plan requiring the parents to be supervised at all times when they were in the presence of the children. That is, they were allowed to be with the children separately, but when together with the children, an approved supervisor had to be present. The caseworker also attempted to enroll the parents "in drug and alcohol assessments," a domestic violence program, and therapy for Raquel C. The parents did not attend the domestic violence program.

When the family-based caseworker met with Raquel C. on October 29, 2018, Raquel C. told the caseworker about two incidents of domestic violence that had just occurred: one on October 26th and one on October 27th. Raquel C. told the caseworker that during one incident, Armando S. had searched her cell phone and "found inappropriate things." "He got upset, and then he restrained her and slapped her across the face, which left a bruise." The following day, Raquel C. left the home due to a "domestic violence incident" and then saw Armando S. was following her. Raquel C. told the caseworker that she was scared and ran into a church to call 9-1-1.

At the beginning of the case, Armando S. admitted to the family-based caseworker to using cocaine and marijuana, while Raquel C. admitted to using cocaine, methamphetamines, and amphetamines. During the family-based case from August to December 2018, Armando S. was never compliant with the caseworker's monthly requests to submit to drug testing. On December 1, 2018, the family-based caseworker received a call from Raquel C. who said that Armando S. had overdosed on MDMA, also known as Ecstasy, in the presence of the children. The paramedics

had gone to the home and transported him to the hospital. A statement given by Raquel C. to a police detective on November 30, 2018 was admitted in evidence and describes how she found Armando S. unresponsive after he told her he had taken Ecstasy. Raquel C. further told the caseworker that Armando S. was in violation of a protective order and was going to be arrested. She also admitted they were both in violation of the safety plan for being together with the children without an approved supervisor present. The family-based caseworker testified the children were then removed from the home and the case was transferred to legal-based services.

Armando S. either tested positive for illegal drugs or refused drug tests during the pendency of this case. On November 18, 2019, his hair follicle test was positive for amphetamines, methamphetamines, and cocaine. While he was with Lifetime Recovery on January 31, 2020, his urinalysis tested positive for methamphetamines. On February 26, 2020, he refused to test, which is counted as a positive test result. On April 7, 2020, Armando S. completed his Lifetime Recovery outpatient drug treatment program. A little over one month later, on May 26, 2020, his hair follicle test was positive for amphetamines and methamphetamines. On July 15, 2020, his hair follicle test was positive for MDMA, also known as Ecstasy. Thus, even after overdosing on Ecstasy in the presence of his children, the removal of his children, and his subsequent completion of a drug recovery program, Armando S. was using Ecstasy again. He had shown no progress in the almost two years since the removal of his children. There was also evidence that Armando S. never admitted to having a substance abuse problem or whether it affected his children. He claimed the overdose that led to the removal of his children was due to someone putting something in his drink and blamed his positive drug tests on taking NyQuil.

Like Armando S., Raquel C. tested positive for illegal drugs during the pendency of the case. Her hair follicle tests were positive for amphetamines and methamphetamines on the following dates: November 18, 2019; February 20, 2020; March 23, 2020; May 26, 2020; and July

15, 2020. She was also noncompliant in submitting to her monthly urinalysis drug tests for the Department during 2019. When asked to return to Elite Drug Counseling following her positive hair follicle test on November 18, 2019, she failed to follow through and was unsuccessfully discharged in January 2020. When her hair follicle test was positive on February 20, 2020, she was again referred for a drug assessment. While she did become involved with Lifetime Recovery in March 2020, that same month her hair follicle test was positive again for methamphetamines and amphetamines. She completed the Lifetime Recovery program on May 14, 2020. Less than a week later, her hair follicle test was positive for methamphetamines and amphetamines. Right before trial, on July 15, 2020, she submitted to a hair follicle test that was positive for methamphetamines, this time in a higher quantity than the test conducted on May 26, 2020. Thus, after twenty months and participating in different drug treatment programs, Raquel C. did not stop using illegal drugs in order to care for her children.

The drug usage by both parents affected their ability to see their children during the pendency of the case. In February 2020, the Department began requiring them to provide negative drug tests in order to see the children. Because they could not provide clean tests or because they did not test, they missed multiple visits with the children. Although both parents were aware of the other's drug use, neither one acknowledged how it affected their children. Raquel C. admitted to her therapist that she used drugs with Armando S., but she minimized the drug usage, telling the counselor that "it's not like [Armando S.] and [she] [were] 'big time' drug users."

In addition to the evidence of substance abuse by the parents, there was also evidence at trial of domestic violence between the parents. Because of a protective order against Armando S., even though Armando S. and Raquel C. were in an ongoing relationship, they were not allowed to the visit the children together during this case. As noted previously, there were two instances of domestic violence in late October 2018 that were reported by Raquel C. to the family-based

caseworker. Also admitted in evidence was a police report dated January 2, 2018, in which Raquel C. describes Armando S. punching her and slapping her while the children were present, causing a cut on the bridge of her nose and swelling on the left side of her face. Pictures showing Raquel C.'s injuries were admitted in evidence.

Further, Linda Guerrero, Armando S.'s Lifetime Recovery substance abuse counselor, testified that Armando S. admitted to her that domestic violence did occur between him and Raquel C. when he used drugs. As part of his service plan, Armando S. was referred to Family Violence Prevention to complete his family violence class; however, he refused to pay for the sessions and did not complete the program. Instead, he completed an online domestic violence class that was significantly shorter than the one he was ordered to take. Armando S. never admitted that domestic violence was a problem in his relationship with Raquel C. At trial, Armando S. denied ever having told Guerrero that he committed domestic violence and emphatically stated that he had never committed domestic violence against anyone. During her testimony, Raquel C. also denied any domestic violence in her relationship with Armando S. With regard to the January 2, 2018 assault that led to the protective order against Armando S., she testified her injuries occurred in the same way as described by Armando S. during his testimony: one of the children accidentally hurt her. When confronted during cross-examination with her police statement from January 2, 2018 in which she stated that Armando S. punched and slapped her in the face three times and in the stomach while the children were present, Raquel C. claimed she had lied about the domestic violence and that Armando S. had never hurt her. There was also testimony that because Raquel C. would not cooperate with the prosecution, all of the family violence and protective order cases against Armando S. were dismissed. The legal caseworker testified at trial that neither parent had acknowledged the trauma their children likely experienced while witnessing the ongoing domestic violence between them. At the time of trial, Armando S. and Raquel C. continued to live together.

In addition to evidence of domestic violence, there was also evidence that Armando S. had trouble controlling his anger. Jennifer Scardino, the legal caseworker, testified Armando S. was aggressive to her on multiple occasions, mostly in text messages. When Armando S. threatened her that her "time was coming", Scardino was taken off the case. He also threatened the second legal caseworker, Mildred Hohensee. According to Hohensee, he threatened her job if she continued to go against what he felt should be done with his children. Thus, Hohensee testified she had to go through his attorney in order to have "conversations" with him. A CASA volunteer testified that Armando S. was also aggressive with him. At the courthouse during a break from a hearing in which the CASA volunteer testified, the CASA volunteer was sitting on a bench and Armando S. was on the other side of the hall when Armando S. caught the CASA volunteer's eye. Armando S. rushed at the CASA volunteer and stopped just short of the bench where the CASA volunteer was sitting. Armando S. just stared at the CASA volunteer. The CASA volunteer, a retired Texas Department of Public Safety officer with thirty-two years of experience, testified he felt Armando S.'s actions were aggressive. When asked at trial about his aggressive behavior toward Department workers, Armando S. justified his behavior by saying that "no matter how nice [he] talked to them, they never gave [him] time with [his] kids."

When the children were removed, D.F.S. was six years old, C.S.S. was five years old, and C.R.S. was three years old. Caseworker Scardino described D.F.S. as being quiet and protective of his younger siblings. Multiple caseworkers testified that D.F.S. had been "parentified" by Armando S. and Raquel C. Indeed, Scardino testified that D.F.S. displayed more parenting skills than Armando S. and Raquel C. Scardino criticized Armando S. for relying too heavily on D.F.S. during parent-child visits to help with the younger children. Specifically, Scardino noted that Armando S. would tell D.F.S. to tell his younger siblings not to disrupt or act out. Scardino also observed Raquel C. interact with the children during parent-child visits. Scardino testified that

there were "a lot of issues with the children acting out when [Raquel C.] would not pay attention to them, and then they would have tantrums." According to Scardino, when the children acted out, Raquel C. did not know how to deal with them and did not appear to have much of a bond with them. The CASA volunteer testified that on August 25, 2019, during one of the parent-child visits, Raquel C. grabbed C.R.S. and tried to make him sit on her lap. C.R.S. screeched and began throwing a tantrum. The CASA volunteer testified that in response to the tantrum, Raquel C. slapped C.R.S. in the mouth. As part of her service plan, Raquel C. completed a parenting class; however, according to the caseworker, her behavior during the parent-child visits was substantially the same as before. The caseworker concluded Raquel C. either did not learn anything from the parenting classes or was unable to apply anything she learned to her visits with her children.

Scardino testified the children have been placed in two separate foster homes and are able to visit each other at least once a week. All three children received play therapy. According to Scardino, the two older children expressed their desire to remain with their respective foster families. Scardino testified that at the time of removal, D.F.S. acted like a parent to his younger siblings and was constantly trying to control and redirect their behavior. However, after a couple of months with his foster family, he stopped trying to parent his younger siblings and began to act like a normal six-year-old boy. C.S.S.'s behavior has also improved since being placed with her foster family. At the time of removal, C.S.S. had several tantrums per week. Scardino testified that since being with her foster family, her tantrums have decreased to average a couple per month. The youngest, C.R.S., was delayed in his speech at the time of removal. Since then, his communication skills have improved.

After hearing all the evidence presented, the trial court terminated Armando S.'s and Raquel C.'s parental rights. They now appeal.

**STANDARD OF REVIEW**

To terminate parental rights pursuant to section 161.001 of the Texas Family Code, the Department has the burden to prove by clear and convincing evidence that parental rights should be terminated pursuant to one of the predicate grounds in subsection 161.001(b)(1) and that termination of parental rights is in the best interest of the child. TEX. FAM. CODE § 161.001(b)(1), (2). In reviewing the legal sufficiency of the evidence to support these findings, we look "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In reviewing the factual sufficiency of the evidence, we consider disputed or conflicting evidence. *Id.* at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). Under these standards, the factfinder is the sole judge of the weight and credibility of the evidence. *Id.*

**PREDICATE GROUNDS**

Both Armando S.'s and Raquel C.'s parental rights were terminated pursuant to the following predicate grounds under section 161.001(b)(1): subsections (E), (O), and (P). *See* TEX. FAM. CODE § 161.001(b)(1)(E), (O), (P). Although Armando S.'s and Raquel C.'s parental rights were terminated pursuant to three separate predicate grounds, Armando S. and Raquel C. have in their respective briefs challenged the sufficiency of the evidence with respect to only one predicate ground on appeal, subsection (E). Because only one predicate ground, along with a best-interest finding, can support the trial court's order of termination, we may affirm the trial court's

termination order on either predicate ground not challenged on appeal (subsection (O) or (P)) so long as we later determine that sufficient evidence supports the trial court's best interest finding.

Nevertheless, because a termination finding under subsection (E) may serve as the basis for a future termination of parental rights proceeding, due process requires that we address any appellate issue regarding the sufficiency of the evidence of a trial court's finding under (E). *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019). Thus, we now turn to the issue of whether legally and factually sufficient evidence supports the termination of Armando S.'s parental rights under subsection (E), and similarly, whether legally and factually sufficient evidence supports the termination of Raquel C.'s parental rights under subsection (E).

Subsection (E) allows termination of parental rights if, along with a best-interest finding, the factfinder finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). Under subsection (E), "endanger" means "to expose a child to loss or injury, or to jeopardize a child's emotional or mental health." *In re C.J.G.*, No. 04-19-00237, 2019 WL 5580253, at *3 (Tex. App.—San Antonio Oct. 30, 2019, no pet.) (citing *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996)). Termination under subsection (E) may not rest on a single act or omission; instead, it must be "a voluntary, deliberate, and conscious course of conduct." *Id*. (quoting *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)). And, under subsection (E), "courts may consider conduct *both before and after* the Department removed the child from the home." *Id*. (quoting *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)) (emphasis added).

While "[a]n endangerment finding often involves physical endangerment," "the statute does not require that the parent's conduct be directed at the child or that the child suffer actual

injury." *In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at * 5 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.). "Rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone." *Id.* (citation omitted).

"Conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *Id.* "Thus, evidence of illegal drug use by a parent and its effect on a parent's life and her ability to parent may establish an endangering course of conduct under subsection (E)." *Id.*; *see In re J.O.A.*, 283 S.W.3d at 346 (holding evidence sufficient to support finding of endangerment even though father had made significant recent improvements because "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices"); *In re K-A.B.M.*, 551 S.W.3d 275, 287 (Tex. App.—El Paso 2018, no pet.) ("A parent's use of drugs and its effect on his or her ability to parent may qualify as an endangering course of conduct."); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E)."). Thus, a pattern of drug abuse will support a finding of conduct endangering a child even if there is no evidence that the drug use injured the child. *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

Similarly, "[d]omestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *see also In re S.R.*, 452 S.W.3d at 361. Additionally, when determining if a child is at risk for abuse or neglect by her parent, the parent's treatment of other children must be considered: "Part of [the risk] calculus includes the harm suffered or the danger faced by other children under the parent's care." *In re E.C.R.*, 402 S.W.3d 239, 248 (Tex. 2013); *see also In re*

*P.N.T.*, 580 S.W.3d 331, 356 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (quoting *In re E.C.R.*, 402 S.W.3d at 248).

As described above, there was evidence at trial of illegal drug abuse by Armando S. and Raquel C. before the children were removed, after the children were removed, and consistently throughout the pendency of the case. Both parents were referred to drug treatment programs, and both tested positive for illegal drugs before and shortly after they completed their programs. Additionally, there was evidence of domestic violence between Raquel C. and Armando S. While Raquel C. and Armando S. point to their own testimony denying the domestic violence, the trial court as finder of fact could have found their testimony not credible and instead relied on the other testimony and exhibits showing domestic violence was a problem with the couple. *See In re S.R.*, 452 S.W.3d at 365 ("As the finder of fact and sole judge of the credibility of the witnesses, the trial court was free to disregard any or all of the parents' self-serving testimony."). Further, having determined domestic violence was a problem in their relationship, the trial court could have found the parents continuing their problematic relationship to be detrimental to the children. Viewing all the evidence in the light most favorable to the trial court's finding, we conclude a reasonable trier of fact could have formed a firm belief or conviction that the evidence of Armando S.'s and Raquel C.'s respective past and current conduct supported a reasonable inference that they engaged in conduct that endangered the physical or emotional well-being of their children. Thus, we hold the evidence is legally sufficient to support the trial court's finding under subsection (E) for each parent.

With regard to factual sufficiency, while there was evidence the parents completed drug treatment and domestic violence classes, there was also evidence that they had not changed their behavior as a result. Thus, after considering the entire record, including any disputed or contrary

evidence, we conclude the evidence is factually sufficient to support the trial court's finding under subsection (E) for each parent.

### CHILDREN'S BEST INTEREST

Armando S. and Raquel C. also argue in their respective briefs that the evidence is legally and factually insufficient to support the trial court's finding that termination of their parental rights was in the best interest of their children. Under Texas law, there is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In determining whether the child's parent is willing and able to provide the child with a safe environment, the factors set out in section 263.307 of the Family Code should be considered. *See* TEX. FAM. CODE § 263.307(b).[1] In addition to these statutory factors, in considering the best interest of the child, a factfinder may also consider the nonexclusive list of factors set forth by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).[2] The *Holley* factors are neither all-encompassing nor does a court need to find evidence of

---

[1]These factors include (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b).

[2]These factors include, but are not limited to, the following: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the child's best interest; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re E.C.R.*, 402 S.W.3d at 249 n.9 (citing *Holley*, 544 S.W.2d at 371-72).

each factor before terminating the parent-child relationship. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Finally, in determining whether termination of the parent-child relationship is in the best interest of a child, a factfinder may judge a parent's future conduct by her past conduct. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

As noted previously, there was evidence presented at trial regarding a history of substance abuse and domestic violence for both parents. While both parents were in drug treatment and completed domestic violence classes, there has been no indication that they have learned from those programs or changed their behavior. There was also evidence that Raquel C. was unable to parent her children and that Armando S. relied too heavily on D.F.S. to, in essence, parent his younger siblings. Neither parent showed improvement during the pendency of the case. Further, neither parent could show they maintained stable housing. During the pendency of the case, the parents lived in five different places, with six months being the longest period they lived in any one location. Only seven weeks before trial did they move into a home that seemed to be appropriate, and even so, they could not show they had a stable income to pay for their home or support the family. The only proof of income provided by Armando S. was unemployment checks, and Raquel C. indicated at trial that she was dependent on Armando S.'s income.

In contrast to their parents, the children's behavior has improved greatly since they have been in foster care. There was testimony that D.F.S. loves being with his foster family and is doing well in school. The CASA volunteer testified D.F.S. was initially very quiet and withdrawn. Now, he is happy and relaxed. D.F.S.'s foster father testified that when D.F.S. and C.R.S. were first placed in his home, D.F.S. was very shy, quiet, untrusting, and protective of his younger brother, C.R.S. Six-year-old D.F.S. was also behind in his reading. Now he is thriving. With regard to C.R.S., C.R.S. was at first non-verbal, had horrible tantrums, and would throw things. According to the foster father, after two to three times per week of speech therapy and meeting with a therapist

weekly, C.R.S. had improved his speech and his behavior tremendously. The foster father testified he wanted to adopt D.F.S. and C.R.S. Further, the foster father testified he was willing and able to facilitate a sibling relationship with C.S.S. and has built a strong relationship with her foster parents. Similarly, the CASA volunteer testified that when he first met C.R.S. in March 2019 at the emergency shelter, C.R.S. was withdrawn, a little fearful, and not verbal. The CASA volunteer testified that C.R.S. is now very open, smiling, laughing, and verbal. C.R.S. can have a full conversation and has a very strong bond with his foster parents.

With regard to C.S.S., the middle child, there was evidence that her behavioral problems have improved since she was placed with her foster family. She was tested at school for an academic learning difference but that has now been resolved. There was testimony that she has made great strides in her emotional well-being and expressing herself. All three siblings attend karate, the same day care, and have in-person visits on the weekends. They also call each other every night before bed. At least once a week they spend the night together in one of the foster homes. There was evidence the two older children expressed a desire to remain with their respective foster family where they are thriving and are bonded. The Department's long-term plan for the children is adoption.

Having reviewed the record and considered all the evidence in the appropriate light for each standard of review, we conclude the trial court could have formed a firm belief or conviction that termination of Armando S.'s and Raquel C.'s parental rights was in the best interest of the children. *See In re J.O.A.*, 283 S.W.3d at 344-45.

### CONCLUSION

Having concluded there is legally and factually sufficient evidence to support the trial court's finding pursuant to subsection (E) as to each parent and having concluded there is legally

and factually sufficient evidence to support the trial court's best-interest finding as to each parent, we affirm the trial court's order terminating Armando S.'s and Raquel C.'s parental rights.

Liza A. Rodriguez, Justice